ST. LOUIS PUBLIC SCHOOLS, Plaintiffs in Error, v. ERSKINE, Defendant in Error.

1. The map of the village of St. Louis made by Auguste Chouteau, one of the reputed founders of said village, about the period of said founding, in 1764, and placed by him in the office of the United States recorder of land titles in the year 1825, having been regarded as a public paper for a long period and inventoried as such, is admissible in evidence to show the plan upon which the town was laid out.

2. The fact that during Spanish times a crucifix or "calvary" was erected on a lot in the village of St. Louis, that annual processions were made to said calvary and ceremonies performed there, that the same was frequented for purposes of devotion until after the change of government, that the person on whose lot said calvary was erected was directed to remove a fence which obstructed the passage of the people thereto for purposes of devotion, would not warrant the conclusion that said lot was dedicated to the church, no usage or custom of the Spanish government authorizing a dedication in that form being shown.

*Error to St. Louis Land Court.*

The facts sufficiently appear in the opinion of the court.

*Casselberry*, for plaintiffs in error.

I. The instruction given on the matter of dedication was erroneous. The act of 1812 did not confirm the lot to the Catholic inhabitants as a place of public devotion. If it did not, then the school title is good. The Catholic inhabitants abandoned the land and removed the cross, and never afterwards claimed it. The act of 1812 reserves to the use of schools all lots "which are not rightfully owned or claimed by any *private* individuals." All property which is not private is reserved for the use of schools. Public property is that which the whole community own in their collective capacity.

Private property is that owned by individuals. The church did not form a separate and distinct corporation. By the treaty, church property was transferred to the United States as public property. The grant to the Schools, therefore, included the land in controversy. It was not claimed by any private person. Being used as a place of public devotion, it was *public* property under the former government. The defendant attempts to deprive the Schools of the property by showing that it belonged to the church, and usurps it as his own as against the church. If the church were to sue him, he would try to make out that the property is vested in the Schools. (See Trustees, &c. v. Indiana, 14 How. 269; Cincinnati v. White's Lessee, 6 Pet. 431; Kissell v. Schools, 18 How. 25.) There being no confirmation to Picard or any other individual, the lot was confirmed either to the Roman Catholic Church or it was reserved for the Schools. It was not confirmed to the church. (14 How. 274.)

*Field,* for defendant in error.

I. Chouteau's map was properly admitted. It was admissible to show the general plan upon which the town was laid out, the size of the several blocks, and the situation of the streets. Its authenticity is unquestioned. (See 2 Amer. State Papers, 537; Kissell v. Schools, 16 Mo. 553; Greenl. Ev. § 21, 142, 145, 570; 6 Pet. 431.) With respect to the calvary, two hypotheses are admissible: " 1. The land may have been used for the purposes of devotion with the consent of Picard the proprietor, and in subordination to his title. The circumstances well warrant this supposition. Such a use of the land only renders the right of Picard to a confirmation by the act of June 13, 1812, the more complete; for the possession by the worshippers was really his possession. Accordingly, the court below properly gave its third instruction. 2. The other hypotheses is, that the ground on which the calvary stood had been dedicated and set apart to the church for the purposes of public devotion, and had been possessed by the church for such purposes prior to 1803, and up to

1813. If such were the truth, then it is plain that the land was confirmed to the church by the act of 1812. The controlling title, under this aspect of the case, would be in the defendant by prescription, against the church under the statutes of limitations; the plaintiff would have no title whatever. Consequently, the court below was justified in giving its fourth instruction framed to meet this particular view of the case." Some of the most valuable property in St. Louis is now held by the Roman Catholic church under a confirmation by the act of 1812 grounded on a simple dedication and user. An example exists in the Cathedral block.

Scott, Judge, delivered the opinion of the court.

The first question that arises in this case is the propriety of the action of the land court in admitting in evidence the plat of the town of St. Louis, placed in the office of the recorder of land titles by Auguste Chouteau in the year 1825. The plat was made in 1764, about the period that the village of St. Louis was founded. Chouteau is reputed as one of the founders of the village. The recorder of land titles, who had been in the office since 1837, testified that it was a public paper, and as such had been inventoried. Auguste Chouteau has been dead many years. Mr. Geyer testified that he had seen the plat in the recorder's office several times; that this map was produced in a case he tried for the Schools twenty-four or twenty-five years ago.

When we consider that in matters of public concern traditionary evidence is admissible as to boundaries, we are at a loss to conceive the ground on which the objection to the evidence is based. Chouteau was not the owner of the land on which the village was laid out, nor does it appear that he had any previous authority to do the act. But his conduct, and that of his colleagues, in laying off the town, was sanctioned and adopted by the Spanish government. For many years the map has been placed in the public office, where all the papers and documents relating to the early land titles in this territory were deposited. It has been exposed to the

examination and scrutiny of all, so that its errors might have been detected. The map was made at a time and in a manner which show that its execution could not have been prompted by any sinister motive. We know that it has frequently been used in this court to show the plan and extent of the ancient village as originally laid out by its founders. For such purposes, when all the circumstances attending this map are considered, it is not easy to conceive more satisfactory evidence of facts of so ancient a date. If authority is wanted in support of this view of the subject, it may be found in the cases of Morris v. The Lessees of Harmer's Heirs, 7 Pet. 560, and the Commonwealth v. Alburger, 1 Whar. 469.

The defendant claimed the lot in dispute by virtue of the act of Congress of June 13, 1812, as having derived title to it from those who inhabited, cultivated and possessed it prior to the 20th of December, 1803. The plaintiffs claimed under the same act and the acts of 1824 and 1831, and a designation and a setting apart of the lot by the United States officers for school purposes. There was much evidence in the case in relation to a calvary or cross erected on or near the lot immediately after the French revolution by French emigrants, among whom was a priest. The evidence in relation to the precise locality of the cross, and the length of time it was used before it was abandoned, is unsatisfactory and also contradictory. The spot on which the cross was raised was elevated. The base of the cross was twenty-five feet square, made of stone, and was eight or nine feet high. The cross was between twelve and twenty feet in heighth, and was approached on either side by stone steps. To this cross annual processions were made by the Catholic inhabitants for the purpose of religious exercises. Picard, who was the original claimant of the lot, a witness says, consented to the erection of the cross; and the same witness stated that he was ordered by the lieutenant governor to remove his fence to make room for the people who annually assembled. The spot selected for the erection of the cross was chosen on account of its elevation.

The defendant gave evidence of the occupation and possession of the lot by those under whom he claimed prior to the 20th of December, 1803 ; also of a partition of the entire lot, being a quarter of a block, including the lot in dispute, in the year 1815, among the heirs of the original claimant, and that three out of the four heirs of Picard made proof of their shares of the claim before the recorder of land titles under the act of Congress of the 26th of May, 1824, and gave in other evidence. The case was tried by the court sitting as a jury ; and among other declarations of law, the following was made : " If the jury believe that the land in dispute was dedicated prior to 1800 by the Spanish lieutenant governor for the purpose of public worship ; that the Roman Catholic Church at St. Louis took possession of the same, erected a cross or calvary thereon, and used the same for the purposes above mentioned, prior to 1803 and up to 1813, then the plaintiffs can not recover." There was a judgment for the defendant.

The correctness of the foregoing declaration of law was the only point argued in the briefs of the plaintiffs. As there were other declarations of law on the evidence, on which a judgment might have been rendered for the defendant, and as the finding was a general one, if the declaration above set forth is unwarranted the judgment must be reversed. It was very natural that the court should have found that there was no appropriation of the lot in dispute for religious purposes, as the plaintiff did not controvert the fact, but opposed the conclusion of law deduced from it. But in the absence of all law, usage or custom, we do not understand how the erection of a cross upon the lot was a dedication of it to religious purposes, in such sense as would deprive the owner of the ground, upon which the erection was made, of his title to it. Is a dedication to be inferred from the simple fact, even if it was so, that the lieutenant governor ordered the fence to be removed which was in the way of the worshippers ? In all the investigations, which the Spanish titles have undergone, is an instance to be found in which a claim to land

was lost by reason of the erection of a calvary upon it with the consent of the owner? For let it be remembered that the same witness, who testified to the order of the lieuteant governor in relation to the removal of the fence, also stated that it was with the consent of Picard. In the case of the Carondelet commons, a grant or recognition of the right to a common was inferred from the answer of the lieutenant governor to a petition for a concession. But in that case the petition and answer were in writing and preserved among the archives of the government. The use of the lot as a place of devotion, if not designed to be temporary, was certainly never intended to confer any permanent interest or easement in the soil. What has transpired since the cross was abandoned shows this. There has been no claim to the lot on the part of the Catholic community. None of the witnesses agree as to the time when the calvary was abandoned as a place of worship; nor is there the least evidence that since its abandonment the interests of the church have occupied the attention of any of its members. The Catholic inhabitants, who claimed the Cathedral block in the village of St. Louis, did not fail to prove their claim before the recorder of land titles under the act of 1824. Had they conceived that they had any claim to the lot in dispute, would not the occasion have reminded them of it, and could there at that day be any want of evidence of their having used the lot for religious purposes, had they believed that they had a right to be confirmed under the act of 1812? The block, the claim to which was proved up by the Catholic inhabitants before the recorder, was marked with a letter on the ancient map of the village made by Chouteau and in evidence in the cause, which showed that by the founder of the village it was intended for the church. A hole on the original map extending over a great portion of that block is the cause that the letter can not now be seen, but the circumstances make it certain that the block proved up before the recorder by the Catholic inhabitants in 1824 was marked with a letter which showed that it was dedicated to the

church.    According to the plat in the record, how inconvenient was the shape of the lot for the purpose for which it was designed.    It is a parallelogram, three or four times as long as it was broad.    A square or some other figure would have been much more appropriate.    We have been considering the question, whether there was a dedication of the lot, and not whether the conduct of Picard and his heirs furnished any evidence of the abandonment of the lot by them. That question is not now before us; it is one for the jury, who, from all the facts transpiring before the act of 1812 in relation to the occupation and possession of the lot by Picard and his heirs, and what occurred after, will determine whether Picard or his heirs ever had any intention of abandoning any portion of the lot.

In the absence of any law or usage of the Spanish government which authorized it, we can not say that there was a dedication of the property in dispute to the church.    The circumstances do not warrant so harsh an inference.    We can see in this record no authentic act of the government which shows that any such thing was contemplated.    The The use of the property made by the worshippers of the Catholic faith was not inconsistent with the claim of Picard to the ownership of it.    We would not have disturbed this judgment but for the declaration of law on which we have remarked.

We are of the opinion that the first instruction asked by the plaintiffs might have been given.

There were some minor points made in the admission of evidence during the trial, but as they were not very important and have not been stated in the briefs furnished us, we deem it best to pass them over.

Reversed and remanded.    The other judges concur.