GRANT, J.
The plaintiff in error — hereinafter to be designated as the accused — is a native and citizen of France.
He was arrested, prosecuted and convicted in the probate court of this county for cohabiting with a woman not his wife— constituting, if the charge was made out, the offense, under our statute, of adultery. He was tried, with his consent, by the court without a jury. His motion for a new trial having been overruled and sentence passed upon him, he prosecuted error proceedings in the court of common pleas, which thereupon affirmed the judgment. To reverse that affirmance is the prayer of this petition in error.
The accused offered no evidence at the trial, his claim being that the state had not proved its case sufficiently to work his conviction under law. And such is still his contention here.
The facts material to the present question, as disclosed by the record before us, are these, for substance:
The accused has been domiciled in the United States for some two years. In 1917, in Ohio, in due form of its law, he contracted a marriage with the woman charged in the information as being his paramour in the alleged adulterous commerce.
It is the claim of the state that this relation, although entered into under the forms of lawful wedlock, is in fact meretricious, because the accused had before cohabited in France with another woman, under such circumstances and holdings out as would constitute a so-called common law marriage, as that term is understood and allowed in the courts of many states of our union, including Ohio.
The other woman was the prosecuting witness at the trial of this case. Her name of origin was Valentine Biguet. She seems to have first crossed the path of the accused in Paris, in April of 1905. Their meretricious relations appear to have commenced at once, but Charrier — so she says — then told her “lie wouldn’t marry her right away,” for reasons he gave; his words of promise at that time were not verba in presentí, but related wholly to the future. In July of the same year she testifies that he said to her: “You are my wife non), and your daughter Collette is my daughter.” It seems that Collette, although *580 so denominated, really had a decollete origin. The facts disclosed show that the prosecutrix was at the time she “took up” with the accused already the derelict mistress of the Baron de Cool, according to her story. This man turned out to be a misnomer at both ends of his name. He was not barren, for she says he begat Collette, and by the same token he could not at that time have been cool, although later he appears to have cooled off.
The statement that Charrier made to the effect that the girl was his daughter, had regard, as is said, to his intention to adopt her — she being then as to status only one of what, as “the divine Sara” Bernhardt said in her own case, are “the accidents of love.” As to patronymic, Collette went, and for aught that appears, still goes, by the name of her mother — Biguet.
In July, 1905, the claimant says, when Charrier began to call her his wife, she accepted th'e title by beginning to call him husband; and thenceforth she says he and she by mutual consent were held out to the world in which they moved as sustaining that relation. A child was born to them. The Baron, during several years, appears to have been a sort of meal-ticket for the two. He contributed sums of money at intervals, at the instance of the woman, who was undoubtedly instigated in this respect by the accused; as late as 1911, he sent her a thousand francs at one time and this appears to have been a wind-up of that illicit commerce. The woman says that at no time did she expect the baron would marry her; he “was too inch,” she explains.
The money so contributed by the unbarren baron was used, as the woman claims, in the common family fund in part, and a part went to pay. Charrier’s debts — he being in a state of chronic impecuniosity, according to her.
In 1913, the pair emigrated to Canada, settling upon a farm in New Brunswick. On the ship they occupied the same cabin and on shore the hotel bills were rendered to, and paid by the accused, the woman being named in them as his wife and the children as his children. In all these years she says he was promising her to have the marriage solemnized according to the rites of-the faith to which they adhered, but put off the fulfillment upon the excuse of financial impotence. In 1915 he *581 abandoned her, or at least came to the United States, where in 3917 he contracted the formal marriage already related.
. The claim of the prosecuting witness that during her cohabitation with the accused she considered herself as his lawful wife, or that such a "thing as a common-law marriage existed between them, is somewhat shaken by her own admissions. It appears that upon the birth of the second child the certificate issued from the mayor’s office at Paris was to the effect that the child had been given the mother’s maiden name and that the father was unknown.
This, she explains, was because of illness she was unable to attend to the matter herself, and that the data upon which the certificate as made were furnished by her mother and sister; they evidently did not understand that she was a married woman.
It is in evidence also, that she took leases, paid taxes and gave receipts in her name of origin: At one time she effected an insurance on 6000 francs’ worth of furniture and other chattels, which the not infertile baron had furnished, in the same name of Biguet.
She accounts for these signatures by saying that Charrier had gotten into trouble by biting a door-man and they were fearing a damage suit, or a fine, thereupon — just which, is uncertain.
Such are the controlling facts disclosed by the record before us. The question thence arising is — did the trial court apply to them the law in its judgment of conviction ?
Measured by the probable intent of the parties at the time when the claimed common-law marriage is said to have been contracted, it is, in our view, extremely doubtful whether that relation is made out by the evidence; the fact that there was such a thing as a common-law marriage, or even a common law, probably was not known to either of them prior to their coming to the United States; the claim is clearly an afterthought.
From this it may be argued that, in an accusation of crime, the accused is entitled to the benefit of the doubt and so should go acquit.
But we are not inclined to acquiesce in that conclusion. If, wittingly or ignoravtly, the parties by life and conduct brought *582 themselves within the rule whereby a common-law marriage is established, or is necessarily to be inferred, we think the marriage status may be said to be the result. Favoring the judgment attacked, we hold that there is sufficient evidence in this record to justify the inference of a .marriage at common law, as that relation is recognized by the courts of Ohio, so far as the form is concerned.
We reach this conclusion upon the following considerations: Marriage, in contemplation of present time law is a civil contract — nothing more. It is a peculiar contract and has elements not shared by.ordinary contracts. It gives rise to an annexed social status. In theory at least, it is an irrevocable, a perpetual contract. It can be entered into only between persons of opposite sexes and it can not be entered into by persons within certain prohibited degrees of consanguinity.
But these are only incidents, imposed by considerations of necessity or public morals or policy. Aside from them, the contract of marriage involves only a meeting of the minds — which may be inferred from the conduct and acts of the contracting parties — and the execution of the agreement by cohabitation. Unless others are imposed by positive law, these are the sufficient ingredients to constitute the relation. And where others are so imposed, the want of them will not exclude the common law form, in countries where that law prevails, unless the statute in terms takes away the common law right. The presumption always is that the legislature had no such intent. The statute regulates the mode of entering into the contract; it does not confer the right to make it.
From very ancient times — in fact from the introduction of Christianity in England, in the year 605 of our era — the canon law which was brought in with Christianity was adopted and practiced, universally — so universally that it became a part of the common law of England and was probably as venerable as any other part of that law. In Crump v. Morgan, 38 N. C. 91 [40 Am. Dec. 447], the court said:
“It is a mistake to say, that the canon and civil laws, as administered in the ecclesiastical courts of England, are not parts of the common law. Judge Blaekstone, following Lord *583 Hale, classes them as among the unwritten laws of England and as parts of the common law, which by custom, has been adopted and has its own peculiar jurisdiction.” 1 Blacks. Com., 79; Hale’s History of Laws, 27-32.
The canon law, thus grafted upon the common law, was evidenced by various decrees of the popes and ecclesiastical councils. It never required any validation of marriage by way of ceremony or religious sacrament, from the time it became the common law till the Council of Trent, in 1563.
"Whether in England or on the continent, by the canon law clandestine marriages, without ceremony, while they might subject the delinquents to the censures of the church, were nevertheless regarded as valid and were pronounced by the Council of Trent to be “vera matrimonia.” But that famous council, by its decree of November 11, 1563, changed the canon law and made null every marriage not celebrated before the parish or other priest, or by license of the ordinary, and before two or three witnesses. Pursuing this line of inquiry, the court, in Hallett v. Collins, 51 U. S. (10 How.) 174 [13 L. Ed. 376], said:
‘ ‘ But it was not within the power of an ecclesiastical decree, proprio vigore, to affect the status or civil relations of persons. These could only be affected by the supreme civil power. The church might punish by her censures those who disregarded her ordinances; but, until the decree of the council was adopted and confirmed by the civil power, the offspring of a clandestine marriage, which was ecclesiastically void, would be held as canonically legitimate. ’ ’
In England, of course, this decree was never ‘‘adopted and confirmed by the civil power.” Before that time Henry the Eighth of England, in his many efforts to be re-wived, had found it convenient to east off, for his Kingdom, the authority of the See of Rome, and Elizabeth, the fruit of one of his re-wivals, had no appetite to recognize the decrees of a church which had denounced herself as a bastard and both her father and herself as heretics, so it may safely be said that neither “ ’Andsome ’Arry” nor ‘‘redheaded Liz.” as certain uncharitable people have called them, allowed any Council of Trent to interfere with the institution of English marriage as then by English law established. *584 The common law marriage continued to be allowed and recognized in that country until, at the time of our own separation from it, it became our common law instead of that of England. In England it so continued until the house of Lords, by a tie vote in 1843, in Queen v. Millis, 10 Cl. and F. 534, the validity of a common law marriage was denied by reason of the marriage act. The judgment in that case, however, was never drawn in precedent in this country, and its doctrine has been expressly rejected by the courts of Canada; in fact the marriage disallowed by the judgment in that ease, was not an English marriage at all, but an Irish marriage. In England the common law doctrine had already been abrogated by Lord Hardwicke’s Act — 36 Geo. II, and 4 Geo. IY — which required publication of banns or an obtained license, as the conditions of a valid marriage in England. But Lord Hardwicke’s act never applied to the English colonies and we never inherited that, and before the time of the Fourth Geoi’ge we were an independent nation.
It follows that the common law marriage institution, brought from England by our ancestors, has full standing in the courts of such of the United States today as have not denied it by statute.
We are next to consider whether that law is to be allowed to fix the status of the accused and the prosecuting witness, or not. Otherwise stated, the inquiry is as to whether the common law, as it exists here in this respect, obtained in France, where the marriage was contracted, if at all, or in New Brunswick, where the status established in France, if at all, continued or was resumed. Marriage being a civil contract, is to be governed by ihe law of the place where it was made; this, we suppose, is not a matter of dispute.
Shall we, then indulge the presumption that the law of the domicile is also the law of the place of the making of the con tract — the record being silent on the point ?
Kitzman v. Kitzman, 162 Wis. 253, was an action to avoid a marriage with an epileptic, the marriage having been celebrated in Minnesota, where it was voidable, and the parties having returned to their former residence in Wisconsin. The court say:
“The general proposition that a marriage valid where the *585 contract is made, is valid everywhere, carries with it as a necessary eouollary the further proposition that such a marriage comes into a sister jurisdiction with all its inherent infirmities as well as strength. It can acquire no greater sanctity or impregnability by such removal than where solemnized. "When properly challenged here, it can have acquired by reason of the parties returning to this state to live, no more immunity from attack than it would have had if they, from the time of the ceremony and thereafter, had lived in Minnesota and the action was there instituted. We shall give it no higher value than it had there”—
the Minnesota prohibition of marriage of epileptics not being contrary to any declared public policy of Wisconsin.
In Thompson v. Thompson, 202 S. W. 175 (Tex. Civ. App.), it is said that—
“The law of the state where a marriage was celebrated generally affords the criterion for testing its validity.”
Gordon v. Gordon, 283 Ill. 182 [119 N. E. 312, 313], is authority for holding that proof that the relation between a man and woman, meretricious in its inception and prior to any claim of marriage, raises the presumption that it continues meretricious and easts upon the marriage claimant the burden of showing that the cohabitation has become lawful.
It is proper now to observe upon the state of the law of France upon the subject. We have already noticed the decree of the Council of Trent in 1563, changing the Canon law so as to require a ceremonial marriage or by license of the ordinary, and declaring void all marriages not so celebrated, and that England did not accept the change, but continues its recognition of the common law as then established on the subject. France, however, in common with the rest of Catholic Europe, acknowledged the binding force of the decree. That canon law obtained among the French to the time of the revolution succeeding 1789, and later was revived under the modus vivendi between Napoleon and the Pope in form of the concordat of that interregnum period. It was finally superseded, but not much changed by the Code Napoleon, which became the paramount law of France in the last year of the Consulate 1804. The latter did not, as is *586 commonly supposed, introduce much new law. It was a composite work, made up of a compromise between the theretofore customary law of the north of France, which was essentially German, and that of the eastern and southern provinces, which was mainly of Roman origin. It was impossible that it should lay the common-law of England under contribution at all; both because of its elementary habitat, just stated, and especially because Bonaparte manifestly would borrow nothing from a people which, as the severest expression of hatred, he stigmatized as “a nation of shopkeepers.”
That code, articles 144-226, lays down the conditions of marriage. It requires a publication of banns and a civil ceremony in the presence of witnesses. It still remains, in substance, the law of France, on the subject, and was so while the parties involved in this cause cohabited in that country. In international law it is settled that the lex loci governs. If the marriage is valid by the law of the country where it is celebrated, its validity is recognized everywhere. The converse is true; if invalid there, it is invalid everywhere. Commenting on this rule, in both aspects, Judge Story said it “has received the most deliberate sanction of the English and American courts and of foreign jurists.” The important exceptions are incestuous and polygamous marriages.
Westlake — Private International Law Chap. 4 — says that an indispensable condition of a valid marriage is that the lex loci must be satisfied in respect of forms, consent of parents or guardians and capacity of the parties.
In regard to the claimed common law marriage in New Brunswick, our belief is that the claim is without importance. It rests upon alleged promises and announced expectations by Charrier while in that province, to go through the forms of a church marriage, depending on better times for himself financially — the Baron having by that time become really so, so far as paying anything more while his successor in madame’s affections was enjoying what the late Samuel J. Tilden called the “usufruct.” But the words were always in the future tense, while the cohabitation and the holdings out, relied on to establish the marriage, had already produced whatever consequences *587 in the way of fixing the marriage status of the parties could flow from them; their daily repetition could add to that result no new force. At most, they could only ratify a contract already existent and pretty well executed, if it had ever become operative. We are not advised whether the common-law marriage was ever allowed in New Brunswick or not. If the question were material, the strong probability, historically, is that it never was recognized. Lord Hardwicke’s act was in force in England before the conquest of Canada by that power, and what is now New Brunswick — then a part of Nova Scotia — inherited no more than that law permitted. If this were not so, still by the Quebec act of 1774, which covered the territory now New Brunswick, guaranteed to the inhabitants the administration of French law in all matters of civil controversy, reserving to the British crown only the right to apply its own jurisprudence on the criminal side. And this guaranty was peculiarly tender of ecclesiastical rights and laws. A like policy is believed to have there prevailed in substance, operation and effect, down to the time of the British North America Act of 1867, which is the present constitution of the Dominion of Canada, including the maritime provinces.
But, as we have intimated already, in our view no marriage at common law can be predicated on this record, except such as is claimed to have been contracted and to have become effectual while the parties were yet in Paris.
We have then, this state of things: A relation in France which when first established offended the received notions of morality and so was meretricious. From this arises the presumption that the connection continued to be meretricious until proof is forthcoming that the cohabitation became lawful, the burden of repelling this presumption by proof removing it being cast upon the claimant of a legal relation. We have, further, the fact of history that the common law of England, or its equivalent in jurisprudential value, never was the law of France.
And we have the legal corollary that the relation of this man and this woman, established in Paris, in Ohio stands loaded with whatever legal shortcomings and infirmities existed by virtue of the laws of France at the time it was entered into. If that relation continued to be meretricious up to the time when it was *588 ended, and was not at any time a lawful cohabitation, then a lawful marriage of one of the parties to a third party, with its physical consummation, could not be the source of the adulterous intercourse denounced by the statute under which the accused is here prosecuted.
If this were the last word upon the subject, if no more were to be said, then indeed the conclusion of the insufficiency in law of the judgment under review would follow, surely.
But there is a difficulty lurking in the situation. All that we have stated in regard to the laws and their history discussed, rests in assumption. The record before us is silent in regard to them all. They are indeed universally well known, but proof of none of them was offered at the trial below.
The inquiry at once arises, was such proof necessary on the part of the accused to work exoneration for him from the charges of the information ? So far as the law of common-law marriages is concerned, no such proof was necessary, as tending to support the conviction here challenged. As a part of our inherited law, allowed and recognized by the courts of Ohio, judicial notice is taken of it, without more.
The difficulty resides in the question whether the negation of the common law as we have it, or its nonexistence, in France, with the historical basis of its absence from that country, without testimony pro forma produced, can be used to overcome the legal inference that a marriage valid where it was contracted, is valid everywhere, or in aid of the legal presumption that a connection meretricious in origin continues to be so until a lawful relation is shown to have succeeded to it. May we take notice, judicially, of what we know and what the world long has known, at a time when all the witnesses to the matter of fact noticed have long beén dead, and who, were they living and in court, could tell us nothing which we did not already know as well as they could know it ?
The following propositions are stated in 15 Ruling Case Law 1088 et seq., and rest upon undisputed authority:
“The general rule is that matters of history, if sufficiently notorious to be subject to general knowledge, will be judicially noticed. The reason for this recognition has been said to be *589 that the facts of history enter into the construction of the laws, and so must be in the knowledge of the court whose duty it is to construe them. * * * But the knowledge of the courts in this country is not limited to events in the history of the United States, or of the several states, but extends also to other historical events which because of their connection with the history of this country, or because of their general notoriety, may be assumed to be matters of general knowledge.”
As to the last proposition, see Neely v. Henkel, 180 U. S. 109 [45 L. Ed. 448; 21 Sup. Ct. 302],
In Banco De Sonora v. Bankers Mut. Casualty Co. 119 Iowa 450 [95 N. W. 232], it is said:
“As to whether the civil law is the foundation of Mexican jurisprudence, the histories are quite as accessible to the court as to the witnesses. Probably judicial notice should be taken of the fact as a matter of history. * * *
“We know that Mexico was a Spanish province for about three hundred years, and then became, and still is, a republic. At no period of its history has it been under British sovereignty. Its institutions are Latin and not Anglo Saxon, and the common law is not presumed to be in force in any state or country where English institutions have not been established.”
See, also Savage v. O’Neil, 44 N. Y. 298; Norris v. Harris, 15 Cal. 226, 252; Flato v. Mulhall, 72 Mo. 522; Brown v. Wright, 58 Ark. 20 [22 S. W. 1022; 21 L. R. A. 467]; Davis v. Gibson, 56 Fed. 443.
Wigmore, Evi., Sec. 1597, says:
“The principle of necessity, allowing this class of evidence, is the same as that already examined (1582), namely, the matter as to which the history or other treatise is offered must be an ancient one, or one as to which it would be unlikely that a living witness could be obtained.”
The headline of the next section of the same work is:
“Matter must be of General Interest.”
In Morris v. Harmer’s Heirs Lessees 32 U. S. (7 Pet.) 554 [8 L. Ed. 781], Judge Story observes:
“Historical facts of general and public-interest may indeed be proved by reputation, and that reputation may be established *590 by historical works of known character and accuracy. But evidence of this sort is confined * * * to cases where from the nature of the transaction, or the remoteness of the period, or the public and general reception of the facts, a just foundation is laid for the reception of general confidence.”
In Bogardus v. Trinity Church, 4 Sandf. Ch. 633, 724, it is said:
‘ ‘ The statements of historians of established merit * * * are from necessity received as evidence of facts to which they relate, * * * restricted to facts of a public and general nature.”
In McKinnon v. Bliss, 21 N. Y. 206, 216, Selden, J., observes:
‘‘Such evidence is only admissible to prove facts of a general and public nature, and not those which concern individuals and mere local communities. * * * History is admissible only to prove history, that is, such facts as being of interest to a state or nation. ’ ’
Lord Campbell in the Sussex Peerage Case, 11 C. L. and F. 113, said:
“You ask the witness what the law is. He may from his recollection, or on producing or referring to books, say what it is, or that it is correctly stated in such a book.”
In Pickton’s Trial, 30 Howell, St. Tr. 492, Lord Ellenborough’s language was: (
“The text-writers furnish us with their statements of (foreign) law, and that would be good evidence upon the same principle which renders histories admissible. * * # I shall, therefore, receive any book that purports to be a history of the common law of Spain.”
I am now to observe upon what may seem, from these authorities, to be an inferable necessity to have this historical knowledge brought physically before the court in the shape of the book itself or some expert who derives his expertness from having read the book, instead of letting the judge or judges spin the same knowledge out of their own inner-consciousness, where it is known to exist in full vigor and accuracy. For my own part, I must say that I do not, as I conceive, need to be bound *591 in calf or the covers of buckram, in order to tell myself what is contained within books so bound or imparted to me by other calves, who at most can be only messenger-boys, bringing me information which I long before had. A court, I suppose, may take judicial notice of what itself knows, if of the character and quality to make it competent evidence, no matter how eonveyed to him or brought to his attention. In the trial of Spencer Cowper, 13 Howell, St. Tr., 1163, the following dialogue was had — Dr. Crell being on the stand:
“Now, my lord, I will give you the opinion of several ancient authors.
“Baron Hatzell: Pray, doctor, tell us your own observations.
“Dr. Crell: My lord, it must be reading, as well as a man’s own experience, that will make any one a physician; for without the reading of books of that art, the art itself can not be attained to; besides, my lord, I humbly conceive, that in such a difficult case as this, we ought to have a great deference for the reports and opinions of learned men. Neither do I see any reason why I should not quote the fathers of my profession in this case, as well as you gentlemen of the long robe quote Coke upon Littleton and others. But I shall not trouble the court long: I shall only insist on what Ambrose Parey relates in his chapter of Renunciations. ’ ’
"Wigmore — Sec. 1697 — punctures the fallacy of the distinction, thus:
“But the fiction may well be abandoned. The daily use by judges of foreign law books in our libraries, exposes its untruth. Goldsmith’s Chinese Traveler would smile to see the judge refuse to listen to a foreign treatise while on the bench, and then retire to his chambers and take down the same book from the shelves to refresh his judicial memory.”
In closing our perhaps over-long discussion of the law appertaining to this case, we desire to acknowledge our indebtedness to counsel for the able brief which has materially aided our research.
We feel that there are no moral considerations in favor of the accusing witness, or sympathy to be mawkishly bestowed in *592 the ease. She ought to accept the consequences of vagrant amours, nor ask the state to aid in her revenge, however natural to her the pursuit of it may be.
“Heaven has no rage like love to hatred turned,
Nor hell a fury like a woman scorned.”
She did not pursue the baron — except for purposes of revenue, notwithstanding that she was impartial in her sufferings for the two — having borne a child to each of them. It is a plain case of “fifty-fifty.” She seems to have applied the wholesome maxim — “Equality is equity.” What the state is seeking by this prosecution, is not the redress of injured innocence, but the vindication of a really adulterous course of living by punishing one which in the eye of the law is not so.
Our conclusion is that, within judicial knowledge, as a fact of history, the relations and conduct of the parties in France relied on by the state to establish a marriage at common law, were insufficient to operate that effect, in contemplation of the law of that country, by which the validity of the claimed marriage is alone to be measured and tested. To the benefit of this conclusion the accused was, and is entitled.
Some errors are alleged in respect of admission of testimony. We have examined the questions. Probably they were competent as tending to show “state of mind,” which seems to be the drag-net to sweep in much matter that otherwise would clearly be inadmissible. Even if they were not proper, we can not say that they were prejudicial to any substantial right of the accused.
His conviction is not supported by sufficient evidence and the judgment complained of is contrary to law.
It follows that the judgment of the court of common pleas, affirming that of the probate court, should have been one of reversal instead of affirmance, and should itself be reversed for that reason, which is accordingly done.
It follows, further, that — the facts being undisputed and the law being with the accused — this court should proceed to render the judgment in the ease which the probate court should have *593 rendered but did not, namely — a judgment of acquittal, which n now does accordingly.
Dunlap and Lawrence, JJ., concar.