(No. 11480.—Judgment affirmed.)

ADOLPH SCOTT GORDEN, Appellant, *vs.* THOMAS J. GOR-
DEN *et al.* Appellees.

*Opinion filed April 17, 1918.*

1. APPEALS AND ERRORS—*when freehold is involved on appeal
from dismissal of a petition to set aside order of probate of will.*
Where the effect of an order admitting a will to probate is to vest
a freehold estate in the devisees a freehold is involved on an ap-
peal from a subsequent order dismissing a petition to set aside the
order of probate, as a judgment of reversal and the setting aside
of the probate would, temporarily at least, divest the freehold.

2. DESCENT—*from whom an illegitimate son may inherit.* An
illegitimate son can inherit property only from his mother, any
maternal ancestor or any person from whom his mother might have
inherited if living, but at common law he could inherit nothing and
was looked upon as the son of nobody.

3. WILLS—*notice of probate of will is required only to heirs-at-
law, legatees and devisees.* The statute in relation to the probate
of wills only requires the petition to state the name and place of
residence of each of the heirs-at-law, legatees and devisees and re-
quires notice to said parties, only.

4. MARRIAGE—*reputation and cohabitation must concur to raise
presumption of marriage.* To raise a presumption of marriage co-
habitation and reputation must concur, and the strength of the
presumption depends upon the circumstances, but the cohabitation
must be matrimonial and not meretricious, and the reputation must
be founded on general, not divided or singular, opinion.

5. SAME—*presumption of marriage from cohabitation and re-
pute is rebuttable by proof.* The presumption arising in favor of
marriage from evidence of cohabitation and repute is rebutted and
overcome by proof that the relation was meretricious in its incep-
tion, and when shown to have been illicit in its origin it will be
presumed, in the absence of anything showing otherwise, that its
continuance was of the same character.

6. SAME—*when marriage may be proved by pedigree evidence.*
Marriage may be proved by pedigree evidence, but such evidence
must be established by the declarations of deceased blood relatives
made at a time when such relatives could have no possible interest
in the litigation in which such declarations were used.

7. SAME—*when pedigree evidence and repute are admissible to
rebut proof of marriage.* Pedigree evidence and repute are a spe-
cies of hearsay evidence, and where there is no direct proof of

actual marriage but a presumption of marriage is attempted to be established by proof of cohabitation, by pedigree evidence and by repute, declarations of the same parties of a contrary character are admissible in rebuttal.

8. EVIDENCE—*presumptions must arise upon the proof.* Where there is clear proof of a fact no presumptions can be indulged except such as arise upon the proof.

9. SAME—*what may be considered pedigree evidence.* An inscription on a tombstone properly comes under the head of pedigree evidence, and where the question is whether a certain person is the legitimate son of a testator, the fact that he is not named in the will as a legatee or devisee may be considered in connection with the pedigree evidence introduced.

APPEAL from the Circuit Court of Christian county; the Hon. WILLIAM B. WRIGHT, Judge, presiding.

W. B. McBRIDE, FRUMBERG & RUSSELL, and BROWN-RIGG & MASON, for appellant.

J. E. HOGAN, S. S. CLAPPER, and GEORGE T. WALLACE, for appellees.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

A judgment and order were entered in the county court of Christian county in favor of appellees and against appellant, Adolph Scott Gorden, dismissing his petition filed in said court April 9, 1915, to set aside the order of probate of the last will and testament of Randall R. Gorden, deceased, entered October 25, 1913, and to revoke and set aside the order of said court granting letters testamentary to John M. and Thomas J. Gorden, executors named in the will. The petition charged that the testator died possessed of personal property of the value of about $100,000 and seized of real estate of about the same value; that the petitioner is the only son and heir of Randall R. Gorden, and that said purported will is not the last will and testament of the deceased. It appears from the will that the personal property was bequeathed to the First Christian Church of

St. Louis, Missouri, and that the real estate was devised to John M. and Thomas J. Gorden, brothers of the testator. Upon motion of the executors the cause was set down for two distinct hearings, the first to be upon the issue whether or not the petitioner, Adolphus Scott, is the legitimate son of Randall R. Gorden; and the second to be upon the issue whether or not the petitioner, if found to be a legitimate son of the deceased, has any interest in the estate that would permit him to have said order of court set aside as petitioned by him. The county court found the first issue against petitioner and dismissed his petition as aforesaid. On appeal to the circuit court of said county the same finding, judgment and order were made by that court. On appeal to the Appellate Court for the Third District the cause was by the latter court transferred to this court upon the ground that a freehold is involved in the case.

The appeal was properly transferred to this court. The effect of the order admitting the will to probate was to vest a freehold estate in the lands devised by the testator in the devisees. An order of reversal by this court setting aside the probate of the will would have the effect to divest the freehold, temporarily at least, and therefore a freehold is involved on this appeal. *Craig* v. *Trotter,* 252 Ill. 228; *More* v. *More,* 191 id. 97.

It is admitted by appellees that appellant was not made a party or served with notice in the proceedings to probate said will. If the evidence in this record fails to establish the fact that appellant is the legitimate son and heir of Randall R. Gorden, and if it further appears that no reversible errors appear in the record and proceedings of the circuit court, the judgment of the circuit court must be affirmed, as it is also admitted that appellant was not named in the will as a legatee or devisee or otherwise, and the will in the record also so shows.

An illegitimate son can only inherit property from his mother and any maternal ancestor and any person from

whom his mother might have inherited if living. (Hurd's Stat. 1917, sec. 2, chap. 39.) At common law he could inherit nothing, being looked upon as the son of nobody, and sometimes called *filius nullius*, sometimes *filius populi*. (1 Blackstone's Com. 458.) Our statute in relation to the probate of wills only requires the petition to state the name and place of residence of each of the heirs-at-law, legatees and devisees, and only requires notice of the probate of a will to all the heirs-at-law, legatees and devisees. (Hurd's Stat. 1917, par. 21, p. 2970.)

The decisive issue in this case is upon the question whether or not the appellant is the legitimate son and heir of the testator, Randall R. Gorden. Gorden lived in Blue Mound, Illinois, from 1878 until some time in 1882. His full name was Randall Richardson Gorden. Some of the witnesses referred to him as Randall Gorden, others as Richard Gorden or Dick Gorden. He was a well-to-do business man. He kept company with Mary E. Scott, mother of appellant, in 1877, 1878 and 1879, and died in the year 1913. Mary Scott became pregnant during the year 1879 and gave birth to appellant on May 6, 1880, at her father's home near Blue Mound. Gorden was charged with being the father of appellant by his mother and her father, James Scott, and Gorden had one or more serious rows with the latter on account of this charge. It is not disputed by appellees that appellant is the child of Gorden, but their claim is that he is an illegitimate son.

The testimony upon which the appellant mainly relies to substantiate his claim that he is the legitimate son of the testator is that of his uncle, J. M. Scott, and his aunt, Mrs. Ollie Dills, and her husband, H. B. Dills, who were, respectively, brother, sister and brother-in-law of Mary E. Scott. The testimony of J. M. Scott is, in substance, the following: He was a boarder in 1879, and for some time thereafter, at the old Blue Mound Hotel, in Blue Mound, and during that year Tom Stringer, Herman Michels and Ran-

dall R. Gorden also boarded there. In the fall of that year
Gorden and Mary E. Scott went together to. St. Louis, Mis-
souri. Prior to their trip they both told him they were go-
ing there to get married. After about a week had passed
Gorden returned, and, not hearing from his sister, witness
got busy, and on going to St. Louis located her there at a
maternity home, she having gone there because she was in
"a delicate condition." He could not persuade her to return
with him, but she promised to, and did, return the next
evening, and he saw her at his sister's (Mrs. Ollie Dills)
home just south of Blue Mound, near Decatur, and Gorden
was there, too. Gorden boarded at the old Blue Mound
Hotel after that trip to St. Louis but witness does not know
how long. Witness went to Decatur shortly after that night
and never saw Gorden with his sister thereafter. On that
night he had a conversation with Gorden in which he criti-
cised Gorden's relations with his sister. He had not then
learned of their marriage. Gorden told him to mind his
own business, and said, "I am living under the law and I
know what I am doing." Mary "continued through life
to live as Mary Scott." Appellant "was raised as Adolph
Scott." Witness heard there was a cash payment from Gor-
den to his sister "in settlement of their affairs" but never
heard that there was a bastardy proceeding against Gorden.

Mrs. Ollie Dills and her husband, H. B. Dills, gave tes-
timony as follows: About the first of December, 1879,
Richard Gorden and Mary Scott came together to the Dills
home from the I. C. junction. They did not know Gorden
and Mary were coming and when they saw them coming
they went to meet them. They were smiling and laughing,
and Mrs. Dills said to them, "What is the trouble?" They
replied, "No trouble at all; we just got back from St. Louis
and we are married." They said they were married in
St. Louis. They were not asked and did not say by whom
they were married, and they were not asked and did not say
whether any witnesses were present at the marriage. They

stayed at the Dills home continuously from that time until the following February and together occupied the north room up-stairs. Gorden was away occasionally for half a day or a day, or a night and a day, and while there they conducted themselves towards each other as man and wife and Gorden paid their board and bought Mary's clothes. They occasionally went out together for a drive in a buggy, went together to Decatur and to a singing and to church. During the time they were there Mary's health was bad and her father and mother wanted her to come home, and Gorden consented for her to go. In February, 1880, Mrs. Dills and her two children and Gorden went with Mary to Blue Mound, and Gorden left them at the station, the rest of the party going to the home of James Scott, Mary's father. Mary and Gorden had, prior to this day, visited at the Dills home three or four times, sometimes for half a day at a time, but had never before stayed all night with the Dills. In addition to the foregoing Mrs. Dills testified that she learned about six weeks before Mary left her home that she was pregnant; that she saw Mary about two days after the birth of her child, the appellant, May 6, 1880, and about every six weeks thereafter, at her father's house until Mary's death, in November, 1880; that in all that time Mary was not able to work and was in very poor health; that Gorden was not at her father's house during that time and that he did not attend her funeral; that while Mary was at her father's, and while her father and mother were away from home and while Mrs. Dills was there, Gorden met Mary and her younger sister with Mary's baby, in the corn field, and that "Gorden and his wife stood and talked" for about a half hour; that she did not know where Gorden was when the child was born and did not know that he ever was at her father's but the one time mentioned; that she told her mother about Gorden and Mary living at her house; that she never talked with her father about Mary's marriage, and that neither her father nor her

mother, nor any visitor that she recalls, ever visited at her house while Gorden and Mary were staying there; that on the way to her father's home Gorden and Mary talked about housekeeping, and he said that they would buy a house and go to housekeeping as soon as Mary was strong enough; that after Gorden and Mary separated at the depot, and when the party met her mother at her father's home, her mother said to Mary, "I suppose this is Mrs. Gorden," and that Mary replied, "Sure;" that she remembers three other times since the child was born that she talked with Gorden, the last being about eleven years ago,—about 1906; that when appellant was about four years old Gorden had witness and her sister meet him with appellant at a shoe store in Decatur, where he bought appellant a pair of shoes for $3.50 and said he was a nice boy, and said to witness, "Ollie, that will be the only heir I will ever have;" that appellant went by the name of "Little Gorden" in the family until he was about six years old, and after that he was called Adolph Scott.

Six other witnesses, all of whom were cousins and blood relatives of appellant, testified as follows: Three of them, in substance, that they had heard Gorden say that he had married appellant's mother, one of them adding that he said they were staying with Ollie Dills. One of them further testified that Gorden introduced Mary Scott to him, using this language: "Allow me to introduce Miss Scott as Mrs. Gorden." Two of them testified that it was "the general repute and tradition in the Scott family that Mary Gorden and R. R. Gorden were married." Two of them testified that he said that appellant was his son and he expected to help him or leave him property. Another of them testified that Mary Scott told her before they went to St. Louis that they were going over to get married. Another, that appellant married and went under the name of Adolphus Scott. Another, that Mary's father would not let Gorden come on his place. Another, that he heard his deceased brother say,

about five years after Mary's death, that Gorden and Mary got married.

Four other witnesses, who were apparently not related to appellant, testified to isolated occurrences, in substance as follows: One, a resident of St. Louis, that he heard Gorden say in 1913 that he was not a bachelor and that he had a son living in Illinois. Another, that Gorden said appellant was his son and seemed anxious about him, and cautioned witness and appellant, who were painting together on a scaffold, to be careful and not get hurt. Another, that Gorden showed her a picture of a baby and a lady and said the lady was the boy's mother and he was its father; that he said the lady was dead and referred to her as his wife but did not give the name of the baby or of the lady, and that he spoke of living with her in Missouri but did not mention the town. Another testified that Gorden heard him and others discussing appellant as Adolph Scott, and said to them, "You don't even know his name; he is my boy and his name is Adolph Gorden."

For appellees, Herman Michels testified that he knew Gorden, and that Gorden lived in Blue Mound in 1877, 1878, 1879 and 1880, and that he boarded with Gorden at the Blue Mound Hotel in 1879 up until November of that year; that he saw Gorden there during that winter, and that he, the witness, was at the hotel every week from one to two times during that winter; that he also knew Mary Scott and heard of the fact that she had given birth to a child; that the reputation of Mary Scott was that she was a single woman, and that he never heard of a marriage between her and Gorden until the bringing of this suit; that Gorden's repute was that he was a bachelor.

J. N. Kokendifer testified that he was acquainted with James Scott and Mary Scott and also with Randall R. Gorden; that he boarded with Gorden at the Blue Mound Hotel in the winter of 1879 and 1880 and saw him about three times a day, and that he does not remember of his being

away as much as a week at a time during the winter, and
that if he had been witness would certainly have known
about it; that it was the repute in that neighborhood that
Gorden was an unmarried man; that he never lived with
anyone as his wife during the time that he knew him; that
he was present and heard a quarrel between Gorden and
James Scott, at which time Scott told him he had deceived
his daughter Mary, and that he made threats against Gor-
den; that he (witness) tried to persuade Gorden to marry
Mary, and that Gorden told him he would throw away every
dollar he had before he would marry the girl. Under ob-
jection of appellant he also testified that he saw a paper
or writing in September, 1881, which was called a release,
which recited, in substance, that Mary E. Scott and James
Scott thereby agreed to release Randall R. Gorden, in con-
sideration of $1600, from the charge of bastardy and other
charges, and that said writing was signed by Mary E. Scott
and James Scott, and was also signed by Obert Urick, John
Bowen and Ben Cross as witnesses. He further testified,
without objection by appellant, that Gorden told him in
June, 1880, that he had settled with Mary Scott and the
old man and had paid her $1600, and that he had not mar-
ried her.

John L. Brandt, pastor of the First Christian Church of
St. Louis, testified that about a year before the death of
Gorden he had a conversation with him, in which he told
witness that he was unmarried, and that on other occasions
Gorden told him he had been an old bachelor all his life.

Thomas J. Gorden and John M. Gorden, appellees, both
testified, in substance, that it was the repute in their father's
family that their brother, Randall, had lived and died an
unmarried man and bachelor, and that they had never heard
of his being married to Mary Scott until the bringing of
this suit. A witness was also examined who testified that
James Scott, father of Mary, told him that she and Gorden
were never married; that the wedding was all arranged for

but Gorden did not appear. It is further in evidence by another witness that James Scott borrowed $10 from him to pay a physician for attending Mary at the time she gave birth to appellant and said to the witness that he would make Gorden pay for it; that some time later Scott re-paid the $10 and said to the witness that he had settled the matter with Gorden.

About sixteen other witnesses testified in the case on behalf of appellees, most all of whom were acquaintances of Mary Scott and James Scott and of Gorden and had lived close neighbors to them, and the substance of their testimony is, generally, that it was the repute in their neighborhood that Mary Scott was single up to her death, and that Gorden was an unmarried man and had lived and was known as an old bachelor from about 1877 up until his death, and several of them testified they never heard of a marriage between Mary Scott and Gorden. Most all of these witnesses knew that Mary had given birth to appellant.

Another witness, a lawyer living in Decatur, testified that he recalled a bastardy proceeding in the summer or fall of 1880 against Gorden; that as a notary public he was sent to the country, some five or six miles southeast of Blue Mound, to administer the oath to the prosecutrix in the complaint against Gorden; that he does not recall the name of the young woman who swore to the complaint nor does he remember the name of her father; that the girl was above the average height, rather inclined to be spare, had auburn hair and some freckles on her face and did not look very strong. He also gave a description of her father.

In addition to the foregoing evidence it was proved without contradiction that the tombstone of Mary E. Scott, mother of the appellant, bears the following inscription: "Mary E. Scott, daughter of James R. and M. H. Scott.— Died November 28, 1880, 20 years, 2 months and 2 days." The birth certificate of appellant in evidence recites, in substance, that the name of the child is Adolphus; sex, male;

race or color, white; number of child of "this mother," first; date of birth, May 6, 1880; place of birth, Pleasant View township; age of mother, 20 years; full name of mother, Mary E. Scott; maiden name of mother, Mary Evaline Scott; full name of father, Richard Gorden. The date of the return is June 29, 1880, and is made by R. Tobey, M. D., residence Blue Mound, Illinois. The certificate of death of Mary E. Scott in evidence recited, among other things, as follows: Name, Mary E. Scott; sex, female; age, 20 years, 2 months, 2 days; occupation, milliner; date of death, November 28, 12 A. M.; single; place of death, Lake City, Moultrie county, Illinois; place of burial, Mt. Gilead, Macon county. The report is signed by C. P. Smith, M. D., and is dated December 12, 1880.

The evidence shows that James Scott, father of Mary Scott, died about the first of February, 1902, at the home of his son, James M. Scott. While the record does not disclose whether or not the mother of Mary Scott is living or dead, the inferences to be drawn therefrom are that she was dead at the time of the trial and before this suit was brought.

It requires no argument or further mention of the evidence in this record to show that the finding of the court in this case that appellant was not the legitimate son and heir of Randall R. Gorden was fully sustained by the proofs. The evidence at first blush appears to be overwhelmingly in favor of the court's finding. The burden of proof upon that issue was upon appellant. (26 Cyc. 871; 8 Ency. of Evidence, 441.) There is no proof of a ceremonial marriage in this record. The only evidence in the record that could be construed as tending to show that there was such a marriage is simply the alleged declarations of Gorden and Mary Scott. Gorden is shown by the testimony of numerous witnesses to have said on many occasions after his alleged declarations and conduct at Mrs. Dills' with Mary Scott, that he was not at any time married to her. One

witness, at least, testified that Mary stated after appellant was born that she was not married to Gorden. All of their conduct after Mary is said to have gone from the Dills home to her father shows clearly that they were not married and that they did not so consider. The inscription upon her tombstone is very strong evidence of the fact that her own father and mother regarded her as single and unmarried when they buried her. There is no testimony from any source that James Scott ever said or indicated that his daughter Mary was married to Gorden. According to the evidence the only time that her mother ever indicated that she thought that Mary was married to Gorden was the time that she greeted her daughter and said, "I suppose this is Mrs. Gorden." It seems very strange that she was so easily satisfied upon that point,—one so vital to the good name and repute of her daughter. When we come to consider the further fact that nearly all of her neighbors who lived near them and who knew of the fact of a child being born to Mary had never heard of her being married to Gorden, and the further facts recited in the certificate of birth of appellant and the certificate of death of his mother, we cannot understand very well how it can be seriously contended that appellant has proved his case by a preponderance of the evidence.

It is contended by appellant that inasmuch as his evidence shows that he is the natural son of Randall R. Gorden the presumption arises in his favor that he is the legitimate son of Gorden, and that this presumption has not been overcome by the proof of appellees. The proof of appellees and of appellant shows that the relations of Gorden and Mary Scott were meretricious in the beginning and long prior to any claim of marriage between them. From these facts the presumption arises that such relations continued, unless and until there is proof of change to a lawful relation. (*Robinson* v. *Robinson*, 188 Ill. 371.) Cohabitation and repute do not constitute marriage. They are simply

evidence tending to raise a presumption of marriage, of more or less strength, according to the circumstances of the case. The cohabitation must be matrimonial, and not meretricious, in order to give rise to such presumption. (*Cartwright* v. *McGown,* 121 Ill. 388.) The presumption in favor of marriage from evidence of cohabitation is rebutted and overcome by proof of its being meretricious in its inception. When shown to have been illicit in its origin, it will be presumed, in the absence of anything showing otherwise, that its continuance was of the same character, and illegal. *Cartwright* v. *McGown, supra.*

It is true that if we consider only the proof that appellant is the son of Randall Gorden, with that proof alone the presumption would arise that he is the legitimate son of Gorden. But we are not dealing simply with presumptions in this record. All the facts have been introduced touching the question of the legitimacy of the appellant. Where there is clear proof of a fact, no presumptions can be indulged except such as arise upon the proof. (*Chicago, Burlington and Quincy Railroad Co.* v. *VanPatten,* 74 Ill. 91.) The presumption of marriage arising from cohabitation and repute is rebuttable, and where it is shown that the cohabitation began meretriciously, the burden is upon the person claiming the marriage to show it, independently of the presumption. (*Bey* v. *Bey,* 83 N. J. Eq. 239.) It is not only shown by the evidence of appellant, but also by that of appellees, that the relations between Gorden and Mary Scott were in the beginning meretricious. We have all the facts, or are supposed to have them, bearing upon the question of a marriage between Gorden and appellant's mother, and the question in this case now is not one upon presumptions but upon all the facts proved in the case. Appellant's entire case, no matter from what standpoint it may be viewed, is contradicted by the evidence of appellees, and appellant's testimony is by no means all harmonious with the theory that there was a marriage between Gorden and

appellant's mother. At the very time the Dills testify that Gorden was living in their home with Mary Scott as his wife, according to two witnesses testifying for the appellees he was a boarder at the Blue Mound Hotel and was not missed from the hotel by either one of these witnesses. J. M. Scott's testimony upon this point tends strongly to corroborate these two witnesses.

Appellant contends that his case is supported by what is known as pedigree evidence. Marriage may be proved by such evidence, but the evidence must be established by the declarations of deceased blood relatives made at a time when such relatives could have no possible interest in the litigation in which such declarations were used. (2 Jones on Evidence, [1913] sec. 312, p. 704.) The only competent evidence introduced by appellant as pedigree evidence was the declarations of Randall Gorden, Mary Scott and John Bowen, the last named being a cousin of Mary. This evidence was rebutted by appellees by the introduction of contrary declarations of Gorden and Mary Scott to the effect that they were not married, by the declarations of James Scott, father of Mary, to the effect that they were never married, and also by the inscription on the tombstone of Mary, which properly comes under the head of pedigree evidence. (2 Jones on Evidence, sec. 312.) Another circumstance to be taken in connection with the other pedigree evidence is the fact that appellant was not named as a legatee or devisee in the will of Gorden.

Appellant also relies upon another species of evidence known as repute, in connection with the cohabitation of Gorden and Mary Scott. Only two witnesses testified to such repute on behalf of appellant, and they confined such repute to the Scott family, and these two witnesses were blood relatives of appellant, being cousins. Such repute was not pedigree evidence, as it did not purport to be limited by any boundary except repute in the Scott family. This repute was overwhelmed by the testimony of a large num-

ber of former acquaintances and neighbors of appellant's parents, to the effect that the repute of both of them in their community was that they were unmarried and were never married up to the time of their death. It will thus be seen that from whatever angle appellant's evidence is viewed it is overwhelmed at all points.

Both parties submitted propositions of law to the court for its holding, and the appellant has argued that the court made a number of errors in such holdings and also in the admission of evidence on the trial. If the propositions of law were properly submitted in this case there is no error pointed out by appellant of sufficient character to call for a reversal of this judgment. The same questions, practically, are presented by the assignments of error on the court's rulings on the admission of evidence. It was error in the court to admit in evidence the contents, or the substance thereof, of the alleged contract or release, by which appellees claimed that Gorden was released from all claims by reason of the charge of bastardy and other charges by Mary Scott and James Scott in consideration of the payment of $1600, without proof of the signatures of Mary Scott and James Scott. We do not think that the court's holdings in this case should be held reversible error. The same evidence, practically, was received by the court in the shape of declarations of Gorden, and they were received without any objection on the part of appellant.

It is also very earnestly argued by appellant that it was error in the court to admit evidence of the repute of appellant's parents that they were unmarried and so remained from 1877 until their death, in rebuttal of appellant's case. We have just seen that the undertaking of appellant was to prove the marriage of his parents by their declarations, by cohabitation, by pedigree evidence and by repute in the Scott family. Pedigree evidence and repute are a species of hearsay evidence, and we are of the opinion that the evidence of repute by appellees was clearly admissible to

rebut the appellant's case. There was no direct proof of
an actual marriage between the parties,—*i. e.,* a ceremonial
marriage. The evidence that they were married consisted
of the declarations of the parties themselves, which was
much weakened by declarations of the same parties of a
contrary character. It is held in *Northrop* v. *Knowles,* 52
Conn. 522, that where a formal marriage is proved, evi-
dence simply that the parties were reputed in the locality
to be unmarried was insufficient, as a matter of law, to
disprove the marriage; but it is also held in the same case
that where marriage is attempted to be established by repu-
tation, the defendant may be allowed to weaken the evi-
dence by showing that the reputation was not general but
was divided. A part of appellant's case, at least, was based
upon cohabitation and repute and upon pedigree. In proof
of a marriage by cohabitation and reputation the cohabi-
tation and repute must concur in order to raise the pre-
sumption of marriage. Mere cohabitation is not sufficient,
nor is mere repute. Reputation, to prove a marriage, must
be founded upon general, not divided or singular, opinion.
1 Jones on Evidence, sec. 87; *Eldred* v. *Eldred,* 97 Va.
606; *Williams* v. *Herrick,* 21 R. I. 401; *Heminway* v. *Mil-
ler,* 87 Minn. 123; *Drawdy* v. *Hesters,* 130 Ga. 161; *Com-
monwealth* v. *Stump,* (Pa.) 91 Am. Dec. 198.

Complaint is made of the introduction of testimony that
Gorden from about 1882 until several years thereafter exe-
cuted deeds, mortgages, etc., with the recital after his name
that he was single or unmarried. Ordinarily, proof of such
acts after the death of Mary Scott would have little, if
any, weight tending to show that he had never been mar-
ried, but in view of the further fact that he instructed the
scrivener to write his name with such recitals after being
asked the question if he was single, married or a widower,
we think the evidence was competent. It was not neces-
sary in such case to make proof by the production of the

deeds themselves. The testimony was not as to the contents of any certain deed or deeds.

It is objected that the testimony of one of the witnesses that some girl living in the neighborhood where Mary Scott lived swore to a complaint in bastardy against Gorden did not show for certain that it was Mary Scott that signed the complaint. No such objection can now be raised as it was not made at the time the evidence was introduced. Furthermore, the witness gave a description of the party who signed the affidavit that corresponded very closely with the description of others given of Mary Scott. The variation in the description as to the girl's hair, the witness stating it to be auburn and others describing it as sandy, we deem of little moment. It is not uncommon for witnesses to call auburn hair sandy hair.

There are other alleged errors argued by appellant that we do not deem of any special importance in the case either because not raised on the trial or because not well taken, or which are so trivial in character that they cannot be said to have any material bearing on the question of reversal.

The question of the credibility of witnesses is one that is peculiarly the province of the court to determine. Having seen and heard the witnesses, the chancellor is, with his experience in such matters, in much better position to determine questions of credibility than this court can be by simply reading the testimony from the record. We are clearly convinced that the evidence is overwhelmingly in favor of the finding of the court and that another trial in this case could not be reasonably expected to result in a different finding and judgment.

The judgment of the circuit court is therefore affirmed.

*Judgment affirmed.*