MARTHA S. THOMSON, RESPONDENT, v. EARL P. THOMSON, ADMINISTRATOR, GRACE RICHARDSON, APPELLANTS.—163 S. W. (2d) 792.

Kansas City Court of Appeals. June 15, 1942.

*William B. Teasdale* for appellant, Grace Richardson.

*Frank H. Floyd* and *H. G. Pope* for appellant, Earl P. Thomson, Administrator.

*Louis L. Kirchner* and *Don Bush* for respondent, Martha S. Thomson.

SPERRY, C.—Martha S. Thomson, filed a claim in probate court seeking the statutory allowance of $400 for a widow, and an allowance for a year's maintenance and support, from the estate of Peter Thomson, deceased, whose widow she claims to be. Her claim was allowed for $400 absolute allowance and for $1400 maintenance. Earl P. Thomson, a son of deceased and administrator of said estate, and Grace Richardson, a daughter of deceased, defendants, appealed to the circuit court. The cases were consolidated in circuit court, and a trial of the cause resulted in a judgment sustaining the allowances made by probate court. From that judgment both defendants prosecute their appeals to this court.

The sole question presented here is whether or not the evidence supports the judgment of the court to the effect that Martha S. Thomson, claimant, is the legal widow of Peter Thomson, deceased. If the evidence is sufficient to justify a finding to the effect that claimant and deceased were legally married the judgment should be sustained; otherwise it should be reversed.

Peter Thomson and Anna George were married in 1894, and the two defendants herein are the children of that marriage. Anna George Thomson died in 1914, but her mother made her home with Thomson thereafter until her death in 1919. Earl came home from the army in 1918 and was introduced to claimant, under the name of Martha Evans, by his father. Grace also met claimant at about that time, at the Thomson home, and claimant was introduced to her also as Martha Evans. The Thomson family, then living at the home, consisted of Peter, Earl, Grace, the grandmother, and a housekeeper. Claimant did not live there but only came there occasionally. Grace was married and, shortly thereafter, on October 11, 1919, she left home. For a period of about ten years thereafter she did not return home but saw her father occasionally.

Claimant's sister testified in her behalf and stated that, from the date of her marriage in 1911, until 1930, she resided at Chicago and only returned to Kansas City occasionally for visits to her sister and her father and mother; that their parents lived at 2510 Indiana, in Kansas City, where claimant and witness grew up; that she visited

here in April, 1921, and was in the Thomson home; that claimant was living there at that time and was employed as housekeeper; that claimant was then the legal wife of one Fred C. Edelen, who was living but was a mental case; that she requested claimant to move to and live in their father's home because their mother was ill; that deceased said: ''Well, this will be her home some day,'' and that witness answered; ''It isn't now because she has a living husband;'' that claimant's name at that time was Edelen. The witness further testified that she returned to Chicago; that Fred C. Edelen committed suicide in May, 1921; that witness returned to Kansas City, on a visit, at about Christmas time, 1921; that she visited in the Thomson home and, while there at dinner with deceased and claimant, deceased said to her: ''Well, kid, I finally got her to marry me;'' that deceased talked with her several times about being married to claimant; that she told him that her wedding anniversary was August 7th, and deceased said: ''Well, kid, I got you beat. My first anniversary was 8th of August, and I had another one, that is where I have got it over you, I was married in October, too.'' She stated that deceased and claimant accompanied witness and her husband on recreational trips out to parties and banquets almost weekly over a period of years and deceased always introduced claimant, and referred to her, as his wife and that she was so accepted and known among their friends and acquaintances; and that deceased and claimant were generally reputed to be husband and wife in the community in which they lived. She also testified that deceased and claimant made a number of trips to Canada to visit deceased's relatives and that she received mail from them while they were on such trips. She identified an envelope and letter which was addressed to claimant, and also a postal card addressed to her from Canada, as being in the handwriting of and signed by deceased. Said letter and card were placed in evidence and the letter closed as follows: ''Your loving husband, Peter.'' The envelope was addressed to ''Mrs. Peter Thomson, 1239 Ewing Ave., K. C. Mo.'' The postal card was signed ''Your loving husband, Peter.''

Mrs. Wroten testified that she knew deceased and claimant intimately over a period of fifteen years; that witness and her husband, who is now dead, were engaged in the insurance business and attended the ''truck and team owners'' banquets with them, had dinner in their home, and that the Thomsons were entertained in the home of the Wrotens. She testified that, about 1935 or 1936, on an occasion when she and her husband were, with others, having dinner at the home of the Thomsons, witness made a remark to the effect that she and her husband were married in 1921; that deceased replied that ''they (meaning claimant and himself) were married in 1921, the same year we were;'' that deceased and claimant were generally understood, among the club members and friends that they knew and with whom they associated, as husband and wife. She identified

a picture of the truck owners banquet, taken at the Muehlebach Hotel in 1934, and testified that claimant and deceased are shown in said picture, together with the husband of witness and Earl Thomson, all seated at the same table, and that witness attended said banquet.

Madge Evans testified that she had known the Thomson family since 1912, and was reared in the neighborhood of the Thomson home; that she had visited in the Thomson home frequently and they had visited in her home; that she and her husband, claimant and deceased, together with others, attended a dinner at the home of the father-in-law of witness in 1930 or 1931; that, during the course of the dinner, ''Mr. Levy said: 'Bud, did you notice in the forty year column that you have been married forty years,' And he laughed and he said, 'Why, you know that is not true.' That was the first Mrs. Evans, and, of course, it embarrassed Aunt Maud, so in order to cover up, Pete (deceased) says, 'Well, Bud, it hasn't been so very many years since you went down to Higginsville with me to get hitched.' '' She further testified that she had often heard deceased introduce claimant as his wife and that they were generally reputed to be married.

Grace Cooper testified that she had visited in the Thomson home off and on since 1918; that she visited there in 1936 and displayed some snapshot pictures taken by her during the year 1919, and that: ''We were discussing old styles, things that had happened when I had been in their home, and he said—I discussed these pictures, and he said, 'I don't remember them being taken.' And I said, 'They were taken a long time ago.' And he turned to Mrs. Thomson and he said, 'That must have happened before we were married.' That is all he ever said.'' She testified that the Thomson neighborhood treated deceased and claimant as if they were married; that witnness introduced claimant and deceased to a friend of witness as ''Mr. and Mrs. Thomson.''

John B. Gage, mayor of Kansas City, testified to the effect that, as an attorney, deceased consulted him about preparation of a will for him; that he prepared a typewritten draft of such a will for deceased and at his request, which draft was offered in evidence and was identified as being the one prepared by witness. It bore date of 1938, but was never executed and was delivered by Mr. Gage, together with other papers belonging to deceased, to the administrator after death of Thomson. In the draft of the alleged will, which was in evidence, deceased's home at 1239 Ewing Avenue, Kansas City, was bequeathed to ''my beloved wife, Martha S. Thomson,'' and provision for payment of certain trust funds was therein made ''to my wife, Martha S. Thomson.'' It was further provided therein that such bequests were to be in lieu of ''all dower and marital rights she may have in my estate.''

J. Francis O'Sullivan, a lawyer, testified that he lived for many years in the general vicinity of the Thomson home and that he had been employed by deceased to represent him as an attorney on different cases; that deceased introduced claimant to him as "Mrs. Thomson" and that the Thomsons were generally reputed to be husband and wife, in the neighborhood where they resided.

R. L. Dominick, vice-president of the Gate City National Bank testified that deceased transacted business with the above mentioned bank, through the witness, for about twenty-five years; that claimant was introduced to him by deceased as "his wife;" that she had accompanied deceased to the bank and that she and deceased had executed deeds of trust, on real estate owned by deceased, as husband and wife; and he identified one such instrument which was executed by deceased and claimant, to the bank, in 1937, and which was signed by deceased and claimant, in witness' presence, as husband and wife, and was so acknowledged before a notary public who fully corroborated the testimony of Mr. Dominick. Mr. Dominick also identified one other such deed of trust, signed and acknowledged by deceased and claimant as husband and wife, which instrument was so executed in the presence of witness.

Mr. Hensley, vice-president of the Produce Exchange Bank, testified that he was formerly employed by the Gate City National Bank and, as notary public, took the acknowledgment of deceased and claimant, as husband and wife, to deeds of trust executed by them. He corroborated much of the testimony of Mr. Dominick.

Certain deed record books were identified and introduced in evidence. They disclosed that deceased and claimant had executed a number of deeds of trust on real estate, and that therein acknowledged themselves, under oath, to be husband and wife. One deed of trust, dated September 10, 1919, was signed by deceased and he acknowledged himself, under oath, to be single and unmarried. In a deed of trust dated November 24, 1923, deceased and claimant signed and acknowledged same as husband and wife, as they did in various others shown to have been executed in 1924, 1927, and 1937. All such instruments which were in evidence, and which bore date prior to 1921 were signed and acknowledged by deceased as a single person.

Dr. Fricke testified that he was the family physician of the Thomsons from 1937 until the death of deceased; that deceased introduced claimant to him in his office as his wife; that he treated claimant in the Thomson home; that he knew her as Mrs. Thomson; and that deceased and claimant were generally reputed to be husband and wife in the neighborhood where they resided.

Claimant was not permitted to testify in her own behalf, on objection, as to any matter which occurred prior to issuance of the letters of administration.

1230

On behalf of defendants Earl Thomson testified that his father "Asked me if I cared if he got married, I told him: 'No,' I says 'You didn't say anything when I told you I was going to get married. You told me I was twenty-one years old' . . . In 1921, just before I got married, . . . I was married October 19, 1921.'' He testified that his father never told him that he was married; that, in 1921, when Earl introduced his sister's brother-in-law to claimant, she said: ''I beg your pardon, but it is Mrs. Thomson,'' that his father was in the house at the time but did not hear the conversation.

Grace Richardson testified that her father never told her he was married to claimant and that the people in the neighborhood did not believe they were married. She also gave testimony to the effect that while she and her father were visiting in the home of her father's sister in Canada the latter urged her to go home to her father's house; that the sister told deceased that, since he was married, claimant should invite witness to their home, and that deceased became angry, shook his cane at his sister and told her he would invite whom he pleased to live in his home.

Other witnesses testified to the effect that neighbors of the Thomsons questioned the fact of their marriage and denied that deceased had, to their knowledge or in their presence, introduced claimant as his wife, or had held her out as such. There was evidence which tended to prove that the marriage records of Jackson, Cass, and Lafayette counties contain no reference to a license having been issued for the marriage of claimant and deceased. No marriage license was offered in evidence and no witness testified regarding issuance of any; nor was there any evidence regarding the performance of any marriage ceremony.

It is claimant's contention that the evidence herein is sufficient to prove that deceased and claimant were married; and that the countervailing evidence was insufficient to overcome, or to seriously challenge such fact, so that the proof of marriage becomes conclusive.

Defendants contend that, at most, the evidence tended to establish a common-law marriage and that common-law marriages were outlawed by statute enacted in 1921, which statute became effective prior to the death of claimant's husband, Edelen, in May, 1921. Common-law marriages were declared to be invalid by the provisions of Section 3364, Revised Statutes of Missouri 1939, and said section became effective March 31, 1921. [In Re Wild's Estate, 90 S. W. (2d) 804, l. c. 805.] Therefore, if claimant's case rests on a common-law marriage she may not prevail because until after March 31, 1921, she had a legal husband living and, hence, could not have entered into a valid common-law marriage with deceased prior to that date.

Claimant did not attempt to prove by direct or by record evidence that a statutory marriage was entered into between herself and deceased. She contends that her evidence was sufficient to give rise

to the presumption that she and deceased were married; that there was insufficient contradictory evidence to overcome said presumption; that said presumption became final; and that, since they were married, it is presumed that said marriage was legal according to the requirements of the laws of Missouri. Her position is that the same *quantum* and quality of evidence which proves a marriage, under the rule pertaining to presumption, proves a legal marriage, whatever may be the requirement of the law regulating marriages.

There is strong evidence tending to prove the fact that Thomson and claimant conducted themselves as husband and wife, that they so cohabited, and that the local repute was that they were married.

"Save in actions for criminal conversation and in prosecutions for certain crimes the fact of marriage may be proved either by direct evidence or by circumstantial or pesumptive evidence, and either by documentary evidence or by parol, and the sufficiency of the evidence to establish a marriage is governed by the general rules of evidence." [38 C. J., pages 1330, 1331.]

"Independent of any direct or documentary evidence, a marriage may be circumstantially established by the fact that a man and woman have for a considerable period of time openly cohabited as husband and wife and recognized and treated each other as such, so that they are generally reputed to be married among those who have come in contact with them. Such circumstances justify a finding that at the commencement of the cohabitation the parties actually entered into a marriage; . . ." [38 C. J., page 1337.]

Such evidence as is shown in this case, and as is referred to in the two preceding paragraphs hereof, is ". . . regarded as sufficient to create a presumption that a *marriage* took place—whether by mere consent or by ceremony, according as the local law requires." [9 Wigmore on Evidence, sec. 2505.]

"If a marriage in fact is established by evidence or admission, it is presumed to be regular and valid, and the burden of adducing evidence to the contrary rests on the party who attacks it, even though it involves the proving of a negative." [38 C. J. 1325, 1326.]

". . . where man and woman are living together as husband and wife, marriage should always be presumed. . . . A marriage which is once shown is presumed to have been in compliance with legal requirements as to its celebration." [35 Am. Jur., pages 303, 305.]

There is strong circumstantial evidence tending to prove the marriage of claimant and deceased; and there is no substantial evidence, circumstantial or otherwise, tending to contradict the positive evidence of marriage. The fact that the records of Cass, Lafayette and Jackson counties failed to disclose the issuance of a license is wholly insufficient to overcome the proof of marriage here established by circumstantial

evidence. [Galveston, H. & S. W. Ry. Co. v. Cody (Tex.), 50 S. W. 135.]

Section 3364, *supra,* does not change the rules of evidence regarding *proof* of marriage. Said section merely provides that common-law marriages thereafter entered into shall be illegal. Our statutes on marriage provide the procedure to be followed in order that a legal marriage may be entered into; but they do not provide that legal marriages can only be *proved* by offering evidence tending to establish the fact that such statutory steps were taken. Marriage statutes, such as ours, are intended to prescribe the manner by which legal marriages may be contracted; but they do not prescribe a rule of evidence by which marriages may be proved. [In Re Hinman, 131 N. Y. Supp. 861, l. c. 863.]

Defendants take the position that a marriage cannot be proved, since Section 3364, *supra,* became effective, except there be evidence of issuance of a marriage license and the performance of a ceremony; and that it is incumbent on the one who asserts a marriage to prove it in that manner and in no other manner. We do not so interpret the statute.

"Marriage is a fact which may be proven as other facts. . . . The law regards those as married, in the absence of a contrary showing, who hold themselves out by their words and conduct as man and wife. This is a part of the public policy of the State, and concubinage will never be recognized except where the facts affirmatively show it." [Scott v. Scott (Ky.), 252 S. W. 1019, l. c. 1020, 1021.]

Evidence of cohabitation and general repute, and of declarations and conduct of the parties, constitutes primary, strong and convincing proof of the fact of marriage (In Re Imboden's Estate, 86 S. W. 263, l. c. 267); and if such evidence is not rebutted it becomes conclusive and gives rise to a presumption of marriage, which presumption is one of the strongest known to the law and ". . . can be repelled only by the most cogent and satisfactory evidence." [Osmak v. American Car & Foundry Company, 40 S. W. (2d) 714, l. c. 717.] A marriage so proved will be presumed to be legal in every respect. [Osmak v. American Car & Foundry Company, *supra,* l. c. 717.]

It would be most unwise to hold that a marriage cannot be proved except by the introduction of evidence tending to prove issuance of a license and performance of a ceremony. To so hold would be to render it utterly impossible for many couples who were so married to prove the legality of their relationship and the legitimacy of their children. All history teaches us that there is no permanency in the preservation of written records; and the present day bombing and total destruction of entire cities and towns, accompanied by the almost total extinction of the population of such places and the forced migration and dispersal of the survivors, constitute a cogent argument in support of the wisdom of the ancient rules of evidence which permit

proof of marriage by evidence other than that of issuance of a license and proof of performance of a ceremony. Upon such proof, in that manner, of the fact of marriage, it follows that the presumption of legality must follow as a rule of necessity.

Without again reviewing the evidence in this case we hold the same to constitute strong and convincing proof that claimant and deceased were married and that it gives rise to such a presumption; that there was no affirmative, or any strong and cogent circumstantial, or other evidence, to the contrary; and that the marriage between the parties is presumed to be legal. [Maier v. Brock (Mo.), 120 S. W. 1167, l. c. 1174; Nelson v. Jones, 151 S. W. 80, l. c. 83.]

The judgment is affirmed. *Boyer, C.,* concurs.

PER CURIAM:—The foregoing opinion of SPERRY, C., is adopted as the opinion of the court. The judgment is affirmed. All concur.