MYRTLE MARGETT HARTMAN v. VALIER & SPIES MILLING COMPANY and CONTINENTAL CASUALTY COMPANY, Appellants.—No. 40071.—202 S. W. (2d) 1.

Division Two, April 21, 1947.

Motion for Rehearing or to Transfer to Banc Overruled, May 12, 1947.

*Albert I. Graff* and *Malcolm I. Frank* for appellants.

426

*Boyle, Priest & Elliott* and *G. T. Priest* for respondent.

▓ ELLISON, J.—The defendant Milling Company appeals from a judgment of the circuit court of the City of St. Louis reversing a finding and award of the Workmen's Compensation Commission in favor of it and its insurer, and against the claimant-respondent. The Commission had found there was not sufficient competent evidence to support respondent's claim for compensation as widow and sole dependent of Thomas A. Hartman, who admittedly was killed on January 14, 1945, by accident arising out of and in the course of his employment by appellant.

▓ The ground of the Commission's finding was that respondent's evidence failed to prove she had previously been married to the deceased, in consequence of which she could not be his widow and dependent. The circuit court found to the contrary—that the appellant's evidence was insufficient to overcome the presumption of law in favor of respondent's marriage to the deceased. The sole question all the way through the case was marriage vel non. Appellant's brief splits this issue into two parts: (1) was a marriage ceremony performed between the respondent and the deceased at Belleville, Illinois on September 17, 1942, as she testified? (2) is there a presumption of law in favor of marriage in the case of a compensation claim such as this?

First as to the facts, stated chronologically. The respondent testified she had been married once before in July, 1931, she thought, to H. B. Hidy, from which marriage two daughters were born, aged respectively 18 and 22 years at the time of the trial on May 28, 1945, which would make the year of their births respectively 1927 and 1923. Hidy divorced her in St. Louis, she testified, because she could not afford to bring the suit herself. She produced a copy of the divorce decree, but it is not preserved in the record. She said she first met her (later) deceased husband, Hartman, in Platte City in 1940 or 1941, while he was working for the Government at a Veterans' Camp. She was living in Platte City then, doing laundry work for the men in that camp. After nine or ten months the camp was moved to Wentzville, Missouri, and Hartman went with it. She moved to Kansas City.

Thereafter, Hartman would come back to visit her in Kansas City over week ends, staying at a hotel. Over a month before their marriage she moved to St. Louis and continued to do laundry work for the men in the camp at Wentzville, which is about 40 miles from St. Louis. With reference to her engagement of marriage with Hartman, she testified:

"Q. Now, will you tell us the circumstances of your marriage to Mr. Hartman? A. The circumstances?

"Q. Yes. A. Well he was working at Wentzville at the time and he came home one afternoon and he said, 'well, lets get married,' and it was on a Saturday and—

"Commissioner Lahey: 'Wentzville, is that Wentzville, Missouri?'

"The Witness: 'Yes, that's Wentzville, Missouri. He said: 'Honey, I have a license, let's go and get married.' He said he wanted to go over to Illinois and get married. I said, 'Why do you want to go to Illinois?' And he said that he bought the license there and wanted to go to Illinois to get married. Therefore that is the reason we went to Belleville, Illinois.''

On cross-examination respondent testified that she didn't mean Hartman proposed marriage to her at Wentzville; that they had previously become engaged while she was living in Kansas City, on one of his numerous trips back there. And the incident narrated in the last paragraph as having occurred in Wentzville was simply Hartman's proposal to *act* on the engagement and have the marriage ceremony performed in Illinois. The conversation occurred in her home in St. Louis, not at Wentzville. He had theretofore been married and divorced and had two sons (or so told her)—indeed had grandchildren. He had lived in Illinos in former years, and his two sons still lived there. But none of Hartman's relatives attended his wedding to respondent in Belleville.

Respondent testified her friends Mr. and Mrs. McClure accompanied her and Hartman on the trip to Belleville in the latter's automobile. Mr. McClure was a "buddie" of Hartman's, both having worked in the Platte City and Wentzville Veterans' Camps. He was not called as a witness. Mrs. McClure had known respondent for five years, at Platte City and before that. On further cross-examination respondent said the reason she and Hartman went to Belleville to be married was, that she had known the pastor of a Pentecostal Church in that city, named Johnson, who had been stationed in Harrisonville, Missouri when she lived there during her first marriage; and a lady friend of her's had told her that Mr. Johnson was in Belleville. So when Hartman asked her "Do you have any particular minister you want?" she answered "Yes, I would like to have Brother ██ Johnson." Respondent telephoned Mrs. McClure at Maplewood, a suburb of St. Louis, about noon of the impending wedding, and asked her and her husband to act as witnesses. The party started about 3 P. M. and the wedding took place about 4:30 P. M.

Respondent narrated that they went to Rev. Johnson's "Mission" as the Pentecostal denomination calls its churches. It was a small building. Hartman handed the minister the license and the latter performed the ceremony. Hartman gave her a ring, which she had when testifying. The minister handed the "paper" back to Hartman.

First she said she didn't sign anything at the wedding, and then that she signed a paper—it was the marriage license. She said the marriage ceremony in the Pentecostal Church is distinctive; that they all knelt down and had a prayer; everybody says a prayer first; and the preacher blessed them. When Mrs. McClure testified, she said the ceremony was "just like any other marriage, I believe. . . . We were standing there; they were holding hands and he just performed the ceremony. I think they had to sign a paper"—a marriage license. She saw Hartman hand the minister a paper. It was "something like our marriage license and it said 'Holy Matrimony.' " The witness, Mrs. McClure, signed her name on it.

With respect to the marriage license, respondent said she did not see it, "only just the headline." She repeated that statement, and was questioned by Commissioner Lahey as follows, after she said she had lost the license:

"Q. You never saw this license only the headline? A. No.

"Q. How long did you have this license when you lost it? A. Well we had it a good while after we got married, we brought it home and put it in the trunk.

"Q. How do you know that it was a marriage license? A. Because I would know that it was. He said that it was a marriage license and I don't think he would lie about it.

"Q. And you say you never looked at it and you don't know whether it was a marriage license or not? A. I know it was.

"Q. How do you know? Because he said it was? A. Well I don't think he would go and get something and get a preacher and get married like that if it wasn't a license.

"Q. I am just asking you, you don't know if it was a marriage license? A. No, sir."

"Q. In other words, you just saw a piece of paper, folded up, and that's about all you did see? A. Yes, but I know it was a license.

"Q. And you never did look at it? A. No, sir."

In explanation of how she lost the marriage license, respondent testified on direct examination, that: "It got lost with some papers. I lost a lot of papers when we were moving. I don't know how come it got lost, but I lost a lot of those papers. Why, I lost a bill that I had to pay over because I had lost that receipt. I lost the abstract of deed to my place, too, and I had to get a recopy of it."

On cross-examination she was questioned about whether her deceased husband left any papers of his own that would require her examination, such as insurance policies or any matters of a private nature—papers among which a marriage license might be found. She answered in the negative, but added that he did leave insurance policies and the papers showing his discharge as a veteran of World War I. She admitted she had all of those, but repeated that she lost

some of her own papers, as stated in the last paragraph, when they moved a few times from house to house in St. Louis.

When asked to describe the minister, *Johnson*, she said: "He was a low heavy-set man. *Dark* hair and a low heavy-set man . . . a short stout man. I imagine he would be in his sixties, he was rather old. . . . They have a Mission there (now) but he is not there no more. He is in California." Mrs. McClure said the minister's name was *Jackson*, as she recalled. She said the church, or mission, was "a little place. Just a little place, small." She said she would recognize the minister if she should see him; that he was: "an elderly man; about fifty (years old), I think. He was stout and middle-sized, with *light* hair, but not gray."

Miss Shirley Brenner, secretary of the Reliable Life Insurance Company, with an office in St. Louis or environs, was a witness before the Commission's referee, and produced two applications for life insurance each for $500, both dated January 12, 1943, about four months after the alleged marriage. They were signed by the deceased Hartman, who described himself as married. The respondent, Myrtle M. Hartman, was designated in both applications as beneficiary and wife. Policies were issued and she filed claims thereon the day after Hartman's death describing herself as his widow.

The respondent Milling Company took and introduced in evidence the depositions of the Rev. Theodore Kimberlin, Rev. Paul Froese and Rev. J. O. Underwood, all ministers of the Pentecostal denomination in Belleville. In substance they all testified there were three Pentecostal churches in that city, respectively located at 201 North Church Street; North Belt at LaSalle; and 807 Sheel Street. Rev. Kimberlin said he had not assumed the pastorate of his church until January, 1944, more than fifteen months after respondent's alleged marriage; and that he was preceded in that charge by Rev. Gobel Lawrence. He testified the church itself kept no records of marriages performed therein, they being private records kept only by the minister who officiated. He stated ministers of his denomination did not unite divorced persons in marriage; and to that end they would interrogate the bride and groom on that point and also examine the license, which should show whether there had been a previous marriage.

Rev. Froese, pastor of the church on North Belt had served in that pastorate since 1939; and Rev. Underwood had been pastor of the church on Sheel Street for three years—since June, 1942. Both of these therefore were in their pastorates when respondent's alleged marriage ceremony was performed in September, 1942. Both kept records of such marriages as they had performed, and both said their records showed no ceremony on that date in which a Thomas A. Hartman was groom. Rev. Froese said he had only performed two ceremonies during his whole pastorate since 1939, the first on Christmas Day, 1942, and the other in 1944. He stated he would re-marry

divorced people if of proven Christian character. Rev. Underwood said he had never met Hartman or officiated at his wedding at any time.

Respondent took the deposition in California of Rev. Gobel Lawrence, predecessor of Rev. Kimberlin in the pastorate at the Mission on North Church Street. He testified that on September 17, 1942, the date of respondent's alleged wedding, he had been serving in that church for some sixteen months, and continued thereafter for about fourteen months. He declared he never performed a marriage ceremony without a Marriage Certificate; that he would have it properly signed; and invariably would return it promptly to the County Clerk. He kept no private record of the marriages he had performed, but stated from memory that he had never united in marriage a Thomas Albert Hartman and Myrtle Margett (respondent's Christian name) and really didn't know them. He said there were two other Pentecostal churches in Belleville when he was stationed there, but that he only knew the pastor of one of them, who had a funny German name. The man to whom he referred probably was Rev. Froese, since the pastor of the other church was named Underwood, which is not a German name. None of the four pastors whose depositions were taken were asked if there was a Pentecostal minister named Johnson or Jackson in Belleville in September, 1942. The evidence simply showed what Pentecostal ministers were located there at that time, and that none of them had officiated at respondent's alleged marriage. Appellant introduced in evidence the statutes of Illinois.[1] They showed "common law marriages" had been abolished in that state since 1905, and that the following steps were requisite to marriage: (1) obtention by each party of a physician's medical certificate within 15 days before the issuance of the marriage license; (2) personal appearance and application by both parties for the latter before the county ▮ clerk of the county in which the ceremony is to be performed; (3) an affidavit of both parties as to their respective ages and the "legality" of the marriage; (4) issuance of a marriage license by the clerk which is valid for only 30 days after its date; (5) issuance of a marriage certificate by the officiator at the marriage ceremony—a form for which is usually printed on the back of the license; (6) return of the certificate and license by such officiator to the county clerk within 30 days after the marriage; (7) registry of the certificate by the county clerk. Various fines or penalties are provided for violation of the statutes, ranging from $100 to $500 or $1000, and/or a jail sentence in some instances, against the contracting parties, the physician, abettors, the county clerk and the officiator at the ceremony, these covering solemnization of the marriage without a license; neglect to make and return the cer-

[1]Sec's. 6, 6a, 8, 9 and 11-16, Chap. 89, R. S. Ill. 1941; Smith-Hurd Ill. Ann. Stat. (Perm. Ed.)

tificate of marriage to the county clerk; and neglect of the latter to record it.

In connection with these statutes Oscar L. Becker, county clerk of St. Clair County, Illinois in which Belleville is located, testified he had been serving in that capacity since 1938, and had in his custody the marriage records of the county. He outlined his duties under the statutes, and swore that he had searched his records for 35 days (5 more than required by statute) prior to September 17, 1942 (the date of respondent's alleged marriage); and that there was nothing to show a marriage license had been applied for by Thomas A. Hartman, or that any had been issued. He was not asked whether a certificate for any such marriage had been returned to him.

It is undisputed that respondent and Hartman lived together publicly, as a husband and wife would do, and there is some evidence that they lived together *as* husband and wife, after the alleged marriage ceremony. The respondent and Mrs. McClure so testified. And in addition to that the undisputed documentary evidence showed that Hartman took out the two policies of life insurance heretofore mentioned in which respondent was designated as beneficiary and wife, about four months after the alleged marriage. That fact had great weight with the trial court. In a memorandum opinion filed it was called an *admission* of the marriage by Hartman. The fact that the respondent was divorced from her first husband, Hidy, was established by a copy of the divorce decree, which was not challenged; and neither was Hartman's divorce from his first wife disputed.

The first question to be determined is, whether the issue of respondent's marriage vel non is to be adjudicated under the law of Illinois, where the alleged ceremony was performed, or under the law of Missouri where the parties were domiciled. The rule in Missouri is that the validity of a marriage is governed by the *lex loci contractus*.[2] On the other hand, it was held in Illinois in the Peirce case[3] that the marital status is governed by the *lex loci domicilii*. But, as explained in 35 Am. Jur., pp. 282, 286, secs. 167, 170, which the Peirce case cites, the two rules are not necessarily inconsistent. For while the domiciliary state is empowered to determine the validity within its borders of any marriage relationship, yet ordinarily it recognizes the inception of marriages contracted elsewhere if they were valid there; and applies its own laws only to their regulation, duration and termination.

Illinois does that to a considerable extent. Thus, as held in the Peirce case, supra, it validates extra-territorial common-law marriages

[2]Johnson v. Johnson's Adm'r, 30 Mo. 72, 88(4), 77 Am. Dec. 598; Henderson v. Ressor, 265 Mo. 718, 727-32 (2,4), 178 S. W. 175, 176-9 (2-6); Green v. McDowell, 210 Mo. App. 517, 527 (1,2), 242 S. W. 168, 171 (1).
[3]Peirce v. Peirce, 379 Ill. 185, 191 (2), 39 N. E. (2d) 990, 993 (5-8); In re Estate of Peirce, 310 Ill. App. 481, 485 (2,3).

if they were legal where contracted, and between persons domiciled in that jurisdiction at the time. Likewise, in Ertel v. Ertel, 313 Ill. App. 326, 331(2), which was a suit in equity in Illinois to annul a marriage performed in Missouri on the ground of the groom's mental incompetence, it was held the validity of the marriage must be adjudged under Missouri statutes and decisions.

So we conclude that under the rule in both Missouri and Illinois the question of respondent's marriage vel non must be determined, substantively, but not procedurally, under the law of Illinois. As to the scope of the inquiry, it is hardly necessary to say that no question of common-law marriage is involved. As heretofore stated, such marriages were outlawed in Illinois in 1905; and they were similarly denounced in Missouri by (now) Sec. 3364, R. S. 1939 and Mo. R. S. A. in 1921; both long before respondent's alleged marriage in 1942. Furthermore the alleged marriage was not a common-law marriage because it was ceremonial and not purely contractual. 8 Words & Phrases (Perm. Ed.), pp. 102-108.

Neither can appellant maintain the ceremonial marriage was void, even if the Illinois statutes were disobeyed in any or all of the particulars heretofore mentioned, with reference to: medical certificates; appearances and affidavit by both parties before the county clerk; and issuance, return and registry of the license and marriage certificate. Some rather severe penalties are imposed for violation of some of these requirements, but the Illinois statute does not make the marriage void therefrom. Boysen v. Boysen, 301 Ill. App. 573, 579., And the Missouri rule is the same. State v. Eden, 350 Mo. 932, 936(1, 2), 169 S. W. (2d) 342, 344(4), was a case where a conviction of bigamy was sustained, notwithstanding the defendant testified he obtained the licenses for both marriages from a *justice of the peace*, instead of the county recorder as required by statute. That decision held marriages, other than common-law marriages, are only voidable when tainted by such irregularities. And our Henderson case, supra (marginal note 2), a banc decision, ruled that if an extra-territorial marriage is only voidable in the contracting state, it cannot be collaterally attacked in Missouri after the death of either of the spouses.

As we view the case, appellant must stand here solely on the theory that no marriage ceremony at all was performed in Belleville, Illinois; and that the testimony of the respondent and her witness Mrs. McClure to the contrary was false and perjured. The only other theory consistent with appellant's view that would credit these witnesses with veracity, would be that the marriage was a sham ceremony conducted by some pretended clergyman and arranged by the since deceased Hartman. But even that would not invalidate the marriage in this state, under Sec. 3364, supra, if respondent was deceived thereby. In view of the strict Illinois statutes, we agree it is hard to understand how Hartman got the marriage license, if any; and why

there is not some record of it in the county clerk's office, if one is kept. But the evidence is somewhat hazy both ways.

On that point the county clerk was asked on direct examination: "Is there any application or any permanent record made when a party applies for a license to marry in this county?" And he answered: "It isn't a permanent record. We usually keep the books that contain the application of both parties." But then he continued that he did have a record of those applications for the desired period. And later he searched the books and found no record of any such application by Hartman, and no record of a license issued to Hartman. But he was not asked whether he found the marriage certificate (if any) had been registered; and that seems to be the only document which the Illinois law requires to be registered. Sec's 9, 11, 12, 14, Illinois Statutes (supra, marginal note 1).

The deposition of Rev. Gobel Lawrence, pastor of the Mission on North Church Street in September, 1942, was taken in California nearly three years later in July, 1945. He testified from memory that he had not officiated at the marriage ceremony. But he was not confronted by any of the parties or their photographs, so far as the record shows. And the same was true of the two other incumbent pastors at the time. Their depositions were taken in Belleville in June, 1945.

Appellant argues that the presumption of marriage, invoked by the respondent and accorded by the trial court in this case, is one of those "bats of the law" which ▮ takes flight upon the adduction of the actual facts, citing Mackowik v. K. C., St. J. & C. B. Rd. Co., 196 Mo. 550, 571, 94 S. W. 256, 262(4). But in that case the plaintiff who invoked the presumption was a living witness and able to testify directly to the facts he sought to have presumed. And the decision held the rule might well be different if his mouth had been closed by death. In this case, so far as appears, the deceased Hartman alone could have told where and how he got the marriage license, if he did. But beyond all that the presumption of marriage is a strong presumption of law founded on good morals and public policy.[4]

In one of the few cases we have found, where the evidence was held insufficient to make a prima facie showing of marriage, Dinkelman v. Hovekamp, 336 Mo. 567, 573-4(2), 80 S. W. (2d) 681, 683-4(7), the question was whether a husband had been divorced from his first wife, so that his second marriage was valid. He and his second wife had been married in Illinois and lived together in this state for 23 years until he died. But it was shown that five years before his death

[4]Osmak v. Am. Car & F'dry Co., 328 Mo. 159, 167-9 (4), 40 S. W. (2d) 714, 717 (1), 77 A. L. R. 722, Annotation 729. See also 34 A. L. R. 464, Annotation; Thomson v. Thomson, 236 Mo. App. 1223, 1232 (9, 10), 163 S. W. (2d) 792, 796 (10, 11); In re Wild's Estate (Mo. App.), 90 S. W. (2d) 804, 806 (4).

he had obtained from his first wife for a money consideration a written release of her interest as wife in his and his mother's estates. The decision held this proved the first wife had not been divorced,·and therefore overcame the presumption of his second marriage.

But that decision strengthens respondent's case here. For the undisputed fact that only four months after respondent's alleged marriage to Hartman he took out life insurance in her favor as his wife, strongly supports the presumption of marriage instead of combating it. There is a similar presumption of marriage in Illinois, as shown by the first two cases next cited; and in the other two cases the evidence was considerably like that here. Gorden v. Gorden, 283 Ill. 182, 193-4(4), 119 N. E. 312, 316(5); Flynn v. Troesch, 373 Ill. 275, 293(5), 26 N. E. (2d) 91, 99(8); Western Coal Co. v. Indust. Com., 296 Ill. 408, 411(2), 129 N. E. 779, 780(3, 4); Murrelle v. Indust. Comm., 382 Ill. 128, 131-2, 135-6(5), 46 N. E. (2d) 1007, 1009-10(8).

While the case is somewhat close, we think the ruling of the trial court was correct, and the judgment accordingly is affirmed. All concur.